(Slip Opinion)

# Religious Restrictions on Capital Financing for Historically Black Colleges And Universities

The restriction in 20 U.S.C. § 1066c(c) on the Department of Education's authority to guarantee loans for capital improvements at historically black colleges and universities "in which a substantial portion of its functions is subsumed in a religious mission" violates the Free Exercise Clause of the First Amendment.

The remaining restrictions in the statute can, and must, be construed to avoid further conflict with the Free Exercise Clause. We thus read section 1066c(c) and 20 U.S.C. § 1068e(1) to deny loans under the program only for facilities that are predominantly used for devotional religious activity, or for facilities that are part of an HBCU, or part of a department or branch of an HBCU, that offers only programs of instruction devoted to vocational religious education.

August 15, 2019

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
DEPARTMENT OF EDUCATION

Under the Historically Black Colleges and Universities Capital Financing Program, the Department of Education guarantees loans that fund capital improvements at historically black colleges and universities ("HBCUs"). *See* 20 U.S.C. ch. 28, subch. III, pt. D, §§ 1066–1066g ("Part D"). Congress provided, however, that such loans may not be made "for any educational program, activity or service related to sectarian instruction or religious worship or provided by a school or department of divinity or to an institution in which a substantial portion of its functions is subsumed in a religious mission." *Id*. § 1066c(c). Congress separately barred the Department of Education from using appropriations for HBCU programs, including the capital-financing program, for "a school or department of divinity or any religious worship or sectarian activity." *Id*. § 1068e(1).

Your office has asked whether those restrictions are consistent with the Free Exercise Clause of the First Amendment. *See* Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Steven Menashi, Acting General Counsel, Dep't of Education at 1 (Dec. 11, 2017) ("ED Letter").[1] The Supreme Court set forth the framework for

---

[1] In addition to your office's views on this question, we also considered those of other components of the Department of Justice. *See* Memorandum for the Office of Legal Counsel, from Beth Williams, Assistant Attorney General, Office of Legal Policy, and

reviewing such restrictions in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), and *Locke v. Davey*, 540 U.S. 712 (2004). Those cases establish that the government may not deny generally available funding to a sectarian institution because of its religious character. Religious institutions have the right to participate in such programs on the same terms as secular institutions. At the same time, the government does have general discretion to choose what activities to fund, and that includes the discretion not to fund certain religious uses of funds, such as the training of clergy.

Applying these standards to the restrictions at issue here, we agree that the final portion of section 1066c(c), which denies loans under this program to an institution "in which a substantial portion of its functions is subsumed in a religious mission," discriminates based on the religious character of an institution and does not comply with the Free Exercise Clause. We also agree that the balance of the restrictions can, and must, be construed to avoid further conflict with the Free Exercise Clause. We thus read sections 1066c(c) and 1068e(1) to deny loans under the program only for facilities that are predominantly used for devotional religious activity, or for facilities that are part of an HBCU, or part of a department or branch of an HBCU, that offers only programs of instruction devoted to vocational religious education. *See* 20 U.S.C. § 1003(15). So construed, those restrictions do not deny loan support because of an HBCU's religious character.

## I.

The HBCU capital-financing program authorizes the Secretary of Education "to enter into insurance agreements . . . to guarantee the full payment of principal and interest on qualified bonds." 20 U.S.C. § 1066b(a). The Secretary designates a "qualified bonding authority" to issue bonds

---

Jennifer Dickey, Counsel, Office of Legal Policy, *Re: December 11, 2017 Opinion Request from the Department of Education Office of General Counsel* (Jan. 19, 2018) ("OLP Memo"); Memorandum for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from John M. Gore, Acting Assistant Attorney General, Civil Rights Division, *Re: Department of Education opinion request regarding exclusion of religious schools from Historically Black Colleges and Universities Capital Financing Program* (Jan. 24, 2018) ("CRT Memo"); E-mail for Henry C. Whitaker, Office of Legal Counsel, from Brinton Lucas, Civil Division, *Re: HBCU capital financing opinion request* (Jan. 19, 2018 4:59 PM) ("CIV E-mail").

backed by the federal government; the bonding authority then uses the bond proceeds to fund loans to HBCUs for certain capital projects. *Id*. § 1066b(b). The loans are thus made directly by the bonding authority, but the Department of Education guarantees the repayment of the loan. The agreement between the Department of Education and the current bonding authority, Rice Financial Products Company ("Rice Financial"), makes Rice Financial responsible for most aspects of the program's day-to-day administration, including "all aspects of" evaluating proposals, approving construction schematics and schedules, validating cost estimates, disbursing funds, and collecting interest payments. *See* Agreement to Insure as Between the Department of Education of the United States and Rice Securities, LLC, d/b/a Rice Financial Products Company, Designated Bonding Authority at 21 (Aug. 19, 2009) ("Bond Agreement"). Rice Financial is also responsible for ensuring that capital-improvement loans are allocated "among as many" qualifying HBCUs "as possible." *Id.*

An HBCU is defined as "any historically Black college or university that was established prior to 1964, whose principal mission was, and is, the education of Black Americans," and that meets other accreditation standards. 20 U.S.C. § 1061(2). More than 100 institutions of higher education qualify as HBCUs. E-mail for Henry C. Whitaker, Office of Legal Counsel, from Jed Brinton, Dep't of Education, *Re: HBCU capital financing program* (Jan. 30, 2018 10:35 AM) ("Jan. 30 Brinton E-mail").

In establishing the HBCU capital-financing program in 1992, Congress found that "a significant part of the Federal mission in education has been to attain equal opportunity in higher education for low-income, educationally disadvantaged Americans and African Americans," 20 U.S.C. § 1066(1), and that "the Nation's historically Black colleges and universities . . . have an unparalleled record of fostering the development of African American youth," *id*. § 1066(2). Congress also found that, for a variety of reasons, HBCUs "often lack access to the sources of funding necessary to undertake the necessary capital improvements." *Id*. § 1066(4). "Federal assistance to facilitate low-cost capital," Congress found, "will enable such colleges and universities to continue and expand their educational mission and enhance their significant role in American higher education." *Id*. § 1066(6).

The HBCU capital-financing program funds a broad range of capital projects, including the repair, renovation, or acquisition of a classroom facility, library, laboratory, dormitory, "or other facility customarily used by colleges and universities for instructional or research purposes or for

3

housing students, faculty, and staff." *Id*. § 1066a(5)(A). The program also covers administrative facilities, student centers, equipment, health centers, and more. *Id*. § 1066a(5)(B)–(H). You have informed us that recent, representative projects have included academic buildings, wellness centers, and student unions, and that loans are project-specific rather than institution-specific. E-mail for Henry C. Whitaker, Office of Legal Counsel, from Jed Brinton, Dep't of Education, *Re: HBCU capital financing program* (Jan. 19, 2018 5:28 PM). "[A]bout half of the more than 100 HBCUs have significant religious roots" and several are denominational seminaries. Jan. 30 Brinton E-mail.

As noted, the program is subject to two religious-funding restrictions. First, no loans may be made under Part D "for any educational program, activity or service related to sectarian instruction or religious worship or provided by a school or department of divinity or to an institution in which a substantial portion of its functions is subsumed in a religious mission." 20 U.S.C. § 1066c(c). Second, "[t]he funds appropriated under section 1068h of [title 20] may not be used . . . for a school or department of divinity or any religious worship or sectarian activity." *Id*. § 1068e(1).[2] Rice Financial's Bond Agreement entrusts it with responsibility to ensure that each qualifying institution and capital-improvement loan satisfies these statutory requirements, which are incorporated into the agreement. *See* Bond Agreement at 7, 10, 21.

## II.

The Religion Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. These Clauses generally "require the state to be a neutral in its relations with groups of religious believers and non-believers," and mandate that government power "is no more to be used so as to handicap religions than it is to favor them." *Everson v. Bd. of Educ*., 330 U.S. 1, 18 (1947). That neutrality principle is

---

[2] The restriction in section 1068e(1) applies to several other education programs, including benefits for HBCUs, American Indian-controlled colleges and universities, and other institutions. *See generally* 20 U.S.C. § 1068h. In addition, a separate provision states that "[n]o *grant* may be made under this chapter," which includes Part D, "for any educational program, activity, or service related to sectarian instruction or religious worship." *Id*. § 1062(c)(1) (emphasis added). That provision has no apparent application to the bond insurance program authorized by Part D.

not absolute. Government officials may publicly acknowledge religion, such as through legislative prayer, consistent with long-standing traditions and practices of this country. *See, e.g.*, *Town of Greece v. Galloway*, 572 U.S. 565, 575–76 (2014). The government may also accommodate religious practice through laws that explicitly refer to, and account for, the exercise of religion. *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709, 719–20 (2005). And in some instances, the Clauses may require such an accommodation. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188–90 (2012). But a permissible accommodation stands on a very different footing from "[a] law burdening religious practice that is not neutral or not of general application." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Such laws "must undergo the most rigorous of scrutiny" under the Free Exercise Clause. *Id.*

As the Supreme Court recently made clear in *Trinity Lutheran*, the nondiscrimination principle of the Free Exercise Clause is applicable to government benefit programs. The government may not "'exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it*, from receiving the benefits of public welfare legislation.'" *Trinity Lutheran*, 137 S. Ct. at 2020 (quoting *Everson*, 330 U.S. at 16 (emphasis in original)); *see Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion) (recognizing that the government may not "discriminat[e] in the distribution of public benefits based upon religious status or sincerity").

In *Trinity Lutheran*, a Missouri program offered grants to organizations for purchasing playground surfaces made from recycled tires. 137 S. Ct. at 2017. Although the parties agreed that the Establishment Clause would not bar churches from participating in the program, Missouri had expressly excluded them. *Id*. Because the Missouri program "expressly discriminate[d] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character," the Court subjected the program to "the most exacting scrutiny." *Id*. at 2021. Missouri asserted that this discrimination was justified by its desire to "skat[e] as far as possible from religious establishment concerns," but the Court held that a "policy preference" of "'achieving greater separation of church and State than is already ensured under the Establishment Clause'" was insufficient to justify excluding religious organizations. *Id*. at 2024 (quoting *Widmar v. Vincent*, 454 U.S. 263, 276 (1981)).

In reaching that conclusion, *Trinity Lutheran* distinguished *Locke*, which rejected a Free Exercise Clause challenge to a state scholarship program operated by the state of Washington. The program in *Locke* prohibited awarding scholarships to students pursuing a "degree in theology," which the Court assumed to mean a degree that was "'devotional in nature or designed to induce religious faith.'" 540 U.S. at 716 (quoting position taken in both sides' briefs). *Locke* held that Washington could constitutionally choose not to fund devotional education in order to advance the State's "antiestablishment interests" in "not funding the religious training of clergy." *Id.* at 722 & n.5. Such interests could justify treating religious degrees as different from other degrees, even though the Establishment Clause itself would not have barred such funding. *Locke* emphasized that the program did "not require students to choose between their religious beliefs and receiving a government benefit." *Id.* at 720–21. The scholarships remained available to students attending religious schools, so long as they pursued an academic degree other than devotional theology. *Id.* at 724–25. Thus, as the Court later explained in *Trinity Lutheran*, the student in *Locke* "was not denied a scholarship because of who he *was*; he was denied a scholarship because of what he proposed *to do*—use the funds to prepare for the ministry." 137 S. Ct. at 2023 (emphasis in original).

Under the framework set forth in *Trinity Lutheran*, the constitutionality of a religious-funding restriction will turn on whether the restriction is based upon an institution's religious status or whether it is based upon how the federal support would be used. Restrictions based on religious status are presumptively unconstitutional, whereas restrictions that limit government support for religious activities or uses may be permissible under *Locke*. This distinction is broadly consistent with how the Supreme Court has distinguished between Congress's permissible discretion to allocate federal funds and unconstitutional conditions on the use of those funds. Congress may determine the programs the federal government chooses to fund. *See, e.g.*, *U.S. Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215–16 (2013); *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 549 (1983). And Congress's "power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use." *Rust v. Sullivan*, 500 U.S. 173, 195 n.4 (1991). At the same time, Congress may not condition funding for a federal program on a basis that infringes a person's constitutionally protected freedoms, including the freedom of

speech or the free exercise of religion. *See Alliance for Open Soc'y*, 570 U.S. at 217–18; *Trinity Lutheran*, 137 S. Ct. at 2023. A funding condition may infringe on individual constitutional rights when it sweeps beyond "defining the limits of the federally funded program to defining the recipient." *Alliance for Open Soc'y*, 570 U.S. at 218. But even when the government establishes a secular, neutral aid program, the government may retain a legitimate interest in defining the program to exclude certain religious uses.

We apply this framework for evaluating the constitutionality of the religious-funding restrictions at issue in this opinion. We are mindful, however, that this area of law is still being developed. *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*, 435 P.3d 603 (Mont. 2018) (ruling that the Montana Department of Revenue could not award a tax credit for a donation to an organization that funded scholarships to religious schools, under a Montana constitutional provision that restricted state support of religion more broadly than the federal Establishment Clause), *cert. granted*, 2019 WL 1207018 (U.S. June 28, 2019) (No. 18-1195); *Morris Cty. Bd. of Chosen Freeholders v. Freedom From Religion Found.*, 139 S. Ct. 909, 911 (2019) (Kavanaugh, J., statement respecting denial of certiorari) (noting that "this Court decided *Trinity Lutheran* only recently, and there is not yet a robust post-*Trinity Lutheran* body of case law in the lower courts" on some important open questions).

## III.

The Supreme Court has recognized that the need to comply with the Establishment Clause may justify restrictions that would otherwise amount to impermissible religious discrimination. *See, e.g.*, *Widmar*, 454 U.S. at 271. Consistent with that understanding, both *Trinity Lutheran* and *Locke* addressed whether the religious-funding restrictions in question were required by the Establishment Clause before turning to the Free Exercise Clause. *See Trinity Lutheran*, 137 S. Ct. at 2019 ("The parties agree that the Establishment Clause . . . does not prevent Missouri from including Trinity Lutheran in the Scrap Tire Program."); *Locke*, 540 U.S. at 719 ("Under our Establishment Clause precedent, the link between government funds and religious training is broken by the independent and private choice of recipients."); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 885 n.9 (1995) (Souter, J., dissenting) (describing section 1066c(c) as an effort to comply with the Court's

Establishment Clause precedents). Accordingly, we begin our analysis by considering whether the Establishment Clause requires any of the religious-funding restrictions in sections 1066c(c) and 1068e(1).

## A.

The Supreme Court has long recognized that the government may extend "general . . . benefits to all its citizens without regard to their religious belief." *Everson*, 330 U.S. at 16. The Establishment Clause does not forbid the government from providing services, such as school busing, on the basis of religion-neutral criteria, even if those services facilitate religious activity. *Id*. at 16–18. "[The First] Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary." *Id*. at 18.

In the decades since *Everson*, the Court has repeatedly reaffirmed that "'a significant factor in upholding governmental programs in the face of Establishment Clause attack is their *neutrality* towards religion.'" *Good News Club v. Milford Cent. Sch*., 533 U.S. 98, 114 (2001) (quoting *Rosenberger*, 515 U.S. at 839, and adding emphasis); *see also Mitchell*, 530 U.S. at 809–10 (plurality opinion); *id*. at 838 (O'Connor, J., concurring in the judgment). The "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Rosenberger*, 515 U.S. at 839. The neutrality principle runs throughout the Court's decisions, and is broadly consistent with a tradition of federal support for religious institutions that dates from the time of the Founding.[3]

The Supreme Court has thus repeatedly upheld programs that evenhandedly allocate benefits to a broad class of groups without regard to religious beliefs or practices. *See Good News Club*, 533 U.S. at 114; *Mitchell*, 530 U.S. at 809–14 (plurality opinion); *id*. at 837 (concurring

---

[3] From its earliest days, the federal government has, for example, funded religious education for Indians, provided land grants to religious organizations, and offered tax exemptions to religious bodies. *See, e.g.*, *Walz v, Tax Comm'n*, 397 U.S. 664, 677–78 (1970) (citing early statutes); *Rosenberger*, 515 U.S. at 858–63 (Thomas, J., concurring); *Wallace v. Jaffree*, 472 U.S. 38, 100 (1985) (Rehnquist, J., dissenting); Donald L. Drakeman, *Church, State, and Original Intent* 305–14 (2010); David P. Currie, *The Constitution in Congress: The Federalist Period, 1789–1801*, at 12–13 (1997); Robert L. Cord, *Separation of Church and State: Historic Fact and Current Fiction* 25, 61–82 (1982).

opinion); *Agostini v. Felton*, 521 U.S. 203, 230–31 (1997); *Rosenberger*, 515 U.S. at 840–43; *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 10 (1993); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 395 (1993); *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481, 487–88 (1986); *Mueller v. Allen*, 463 U.S. 388, 398–99 (1983); *Widmar*, 454 U.S. at 273–75; *Bd. of Educ. v. Allen*, 392 U.S. 236, 238, 243–44 (1968); *Everson*, 330 U.S. at 17–18; *Cochran v. La. State Bd. of Educ.*, 281 U.S. 370, 374–75 (1930); *see also Walz v. Tax Comm'n*, 397 U.S. 664, 672–73 (1970). And this Office too has placed great weight on the neutrality of a government aid program in evaluating whether it is consistent with the Establishment Clause. *See Authority of the Department of the Interior to Provide Historic Preservation Grants to Historic Religious Properties Such as the Old North Church*, 27 Op. O.L.C. 91, 104 (2003) ("*Old North Church*") (concluding that the Department of the Interior could provide grants to renovate a still-active house of worship, as part of a general historic preservation program); *Authority of FEMA to Provide Disaster Assistance to Seattle Hebrew Academy*, 26 Op. O.L.C. 114, 122 (2002) ("*Seattle Hebrew Academy*") (opining that FEMA could provide funds for reconstruction after an earthquake to a Hebrew secondary school, as part of a general disaster relief program).

Apart from the religious-funding restrictions, the HBCU capital-financing program fully complies with that baseline requirement of religious neutrality. The statute employs secular criteria to determine which projects may receive government support, and those projects may be undertaken by religious and nonreligious HBCUs alike. The only express statutory requirements for the capital-financing program are that the beneficiaries be HBCUs, *see* 20 U.S.C. § 1066a(1), and that the loans be for one of the "capital projects" listed in section 1066a(5), none of which refers to religious practice or the religious character of the institution. Your office has informed us that the Department and the designated bonding authority, Rice Financial, apply certain other criteria designed to measure the financial risk of the loans, but that those criteria, too, are entirely religion-neutral. The credit criteria set forth in Rice Financial's agreement with the Department are based solely on financial risk and make no mention of religion. *See* Bond Agreement at 82–83.

The Establishment Clause permits the government to include religious institutions, along with secular ones, in a generally available aid program that is secular in content. There is nothing inherently religious in character about loans for capital improvement projects; this is not a program in

which the government is "dol[ing] out crosses or Torahs to [its] citizens." *Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 292 (6th Cir. 2009). None of the capital projects identified in the statute—which range from sewers to student centers—is necessarily religious. 20 U.S.C. § 1066a(5). The program is little different from "'such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks,'" which may be provided to religious and secular institutions alike without violating the Establishment Clause. *Old North Church*, 27 Op. O.L.C. at 104 (quoting *Everson*, 330 U.S. at 17–18); *see Seattle Hebrew Academy*, 26 Op. O.L.C. at 123–24. Nor is it of great significance that some fraction of HBCUs may use these benefits to engage in religious education. The Supreme Court "has long recognized that religious schools pursue two goals, religious instruction, and secular education." *Allen*, 392 U.S. at 245. It is entirely consistent with the Establishment Clause for Congress to support the secular educational functions of religious schools. *Id.* at 245–46. Because the HBCU capital-financing program is a secular, neutral aid program, we do not believe that it would violate the Establishment Clause without the religious-funding restrictions, and therefore, those restrictions are not constitutionally required.

## B.

Although the religious neutrality of a secular government aid program should be sufficient to ensure compliance with the Establishment Clause, the Supreme Court has not been entirely consistent on that matter. In the 1970s and early 1980s, the Court struck down a number of neutral programs that provided aid to sectarian schools for secular purposes on the ground that such aid could be diverted to religious activities. *See, e.g.*, *Meek v. Pittenger*, 421 U.S. 349 (1975); *Aguilar v. Felton*, 473 U.S. 402 (1985). The Court has since expressly overruled several of those decisions. *See, e.g.*, *Mitchell*, 530 U.S. at 835 (plurality opinion) (overruling *Meek*); *id.* at 837 (O'Connor, J., concurring in the judgment, joined by Breyer, J.) (same); *Agostini*, 521 U.S. at 235 (overruling *Aguilar*). But a majority of the Court has yet to hold that neutrality, standing alone, suffices to allow a government benefit program to comply with the Establishment Clause.

In *Mitchell*, four Justices endorsed the bright-line rule that secular government aid does not violate the Establishment Clause. *See* 530 U.S. at

809–14; *see also Wallace*, 472 U.S. at 98–114 (Rehnquist, J., dissenting). As Justice Thomas explained for the plurality, "[i]f the religious, irreligious, and areligious are all alike eligible for government aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government." *Mitchell*, 530 U.S. at 809. Justice O'Connor, however, declined to join the plurality; while she agreed with the *Mitchell* plurality's "recognition that neutrality is an important reason for upholding government-aid programs against Establishment Clause challenges," it was, in her view, only "one of several factors" that should be considered when evaluating such challenges. *Id.* at 838–39. In particular, she left open the possibility that a religion-neutral government program could violate the Establishment Clause if, among other things, it permitted "actual diversion of government aid to religious indoctrination." *Id.* at 840, 867; *see also Old North Church*, 27 Op. O.L.C. at 107–13 (examining other factors). Of relevance to our current inquiry, Justice O'Connor suggested that a "statutory prohibition on 'the making of any payment . . . for religious worship or instruction'" would appropriately ensure that funds are not diverted to a religious use. *Mitchell*, 530 U.S. at 849. As the necessary fifth vote supporting the outcome endorsed by the *Mitchell* plurality, Justice O'Connor's concurrence in *Mitchell* could be viewed as controlling. *See Marks v. United States*, 430 U.S. 188, 193 (1977). Subsequently, in *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), Justice O'Connor was in the five-member majority, which held that a school voucher program—one the Court characterized as allowing diversion of government funds to religious activities only as a result of "true private choice," *id*. at 653—did not require any religious-funding restrictions in order to comply with the Establishment Clause. *See id*. at 653–60; *id*. at 663 (O'Connor, J., concurring) (joining the Court's opinion in full but writing separately to highlight that the Court's decision "marks" no "dramatic break from the past"). But the HBCU capital-financing program, under which the Department guarantees loans for individual capital-improvement projects that the Department approves, does not fit neatly into that category.

The ongoing significance of Justice O'Connor's concurrences remains unclear. Even if her view of the Establishment Clause controlled, however, we do not believe that it would require any of the religious-funding restrictions in the HBCU capital-financing program. First, the government aid in the HBCU program only flows to religious ends based upon, and with the mediation of, private choices. *See Zelman*, 536 U.S. at 672

(O'Connor, J., concurring); *Mitchell*, 530 U.S. at 842 (O'Connor, J., concurring in the judgment); *Indirect Aid to Faith-Based Organizations Under the Charitable Choice Provisions of the Community Solutions Act of 2001*, 25 Op. O.L.C. 127, 128 (2001). As with many government programs, no benefits are disbursed unless private institutions apply to receive them and meet the neutral criteria for allocation. An HBCU, which is a private institution, proposes, constructs, and retains control over the capital project in question. Moreover, the initial loan applications are submitted not to the government, but to the designated bonding authority (also a private entity), which must approve each loan. *See* Bond Agreement at 23, 29–30. Thus, in addition to running the day-to-day operations of the program, the bonding authority has an effective veto over each application. The bonding authority, in turn, is obliged to allocate the loans broadly among all HBCUs, regardless of religious affiliation. *See id.* at 21. Although not identical to a classic voucher program, these layers of intervening choice help sever the "link between government funds and religious training." *Locke*, 540 U.S. at 719; *see also Am. Atheists*, 567 F.3d at 295 (noting that, while the private choice of a formal voucher program "is one way to break the link between government and religion, it is not the only way").

Second, because the loans are being made by a private entity, rather than the government itself, religious-funding restrictions are unnecessary to avoid the "'special Establishment Clause dangers'" that Justice O'Connor perceived when "'the government makes direct money payments to sectarian institutions.'" *Mitchell*, 530 U.S. at 843 (opinion concurring in the judgment) (quoting *Rosenberger*, 515 U.S. at 842). The Establishment Clause does not require the government, for example, to restrict to secular uses the considerable economic benefits of tax deductions and exemptions that are generally available to religious and nonreligious organizations alike, given that tax deductions and exemptions provide at most "indirect economic benefits" to religious organizations. *Walz*, 397 U.S. at 674; *see Zelman*, 536 U.S. at 665–68 (O'Connor, J., concurring) (discussing tax deductions and tax exemptions, as in *Walz* and *Mueller*). That same principle is reflected in *Rosenberger*, in which the Court did not rely on the presence of restrictions against diversion in rejecting an Establishment Clause challenge to the university's paying a third-party contractor to print a religious student newspaper as part of a program providing "printing services to a broad spectrum of student newspapers." 515 U.S. at 843. The Court characterized this benefit as

"incidental to the government's provision of secular services for secular purposes on a religion-neutral basis" and noted that "no public funds flow directly to" the religious newspaper's "coffers." *Id.* at 842, 843–44. Here, likewise, the Department makes no direct monetary payments to any religious institution, but instead guarantees the private financing of HBCU capital projects by insuring bonds issued by a private lender. Because this program does not transfer money directly to religious organizations, it is less likely to require religious-use restrictions on Establishment Clause grounds. *See Steele v. Indus. Dev. Bd. of Metro. Gov't Nashville*, 301 F.3d 401, 413 (6th Cir. 2002) (holding that a similar bond program is "analogous to an indirect financial benefit conferred by a religiously neutral tax or deduction" and thus does not violate the Establishment Clause).[4]

Finally, these same attributes of the HBCU program—that a private lender provides the loans, initially reviews and ultimately approves loan applications, and uses neutral and non-religious criteria—also mitigate any public perception that the government is endorsing religion, another concern expressed by Justice O'Connor in her *Mitchell* concurrence, *see* 530 U.S. at 842–43. The program is not a per-capita aid program like the one in *Mitchell*, in which government agencies disbursed funds directly to religious schools based on their enrollment numbers. Consistent with Justice O'Connor's analysis in *Mitchell*, we believe the above factors are such that "'[n]o reasonable observer is likely to draw . . . an inference that the State itself is endorsing a religious practice or belief,'" *id.* at 843 (quoting *Witters*, 474 U.S. at 493), despite the absence of any religious-funding restrictions. Accordingly, even if Justice O'Connor's concern about diversion of funds to religious activities remained valid and controlling, we do not believe that the Establishment Clause would require the religious-funding restrictions in sections 1066c(c) and 1068e(1).

---

[4] The Solicitor General, in an amicus brief in *Locke*, included the HBCU program among several federal programs that were "distinguishable from the private-choice program" at issue in that case because they involved the provision of "direct financial aid" to organizations. Brief for the United States as Amicus Curiae Supporting Respondent, *Locke v. Davey*, No. 02-1315, 2003 WL 22087613, at *20 n.4 (U.S. 2003). We agree that the HBCU program is distinct from a voucher program, because the decision to guarantee each particular loan in the HBCU program is made by the government (although as noted the designated bonding authority, Rice Financial, also plays an important role in approving each loan). At the same time, the program does not constitute "direct" funding in all respects, because no public funds flow directly to a religious institution.

## C.

We recognize that *Tilton v. Richardson*, 403 U.S. 672, 683 (1971), and *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 762 (1973), might be read to say that the Establishment Clause requires the religious-funding restrictions in sections 1066c(c) and 1068e(1). In *Tilton*, the Court ruled that a college or university educational facility built with a federal construction grant could not be used for sectarian instruction or religious worship, even twenty years after receipt of the grant. 403 U.S. at 683. And in *Nyquist*, the Court prohibited New York from providing "direct money grants" for the "maintenance and repair" of facilities at religious schools, as part of a program for all non-public elementary and secondary schools. 413 U.S. at 762.

In our *Old North Church* and *Seattle Hebrew Academy* opinions, however, we expressed doubt about whether *Tilton* and *Nyquist* remained good law. We noted that "*Tilton* and *Nyquist* are in considerable tension" with more recent Supreme Court cases recognizing that the government does not violate the Establishment Clause when it provides religious organizations with access to government property—and indeed that the government may in some cases be required by the First Amendment to provide such access. *Old North Church*, 27 Op. O.L.C. at 114 (citing *Good News Club*, 533 U.S. 98; *Widmar*, 454 U.S. 263; *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995); *Lamb's Chapel*, 508 U.S. at 384); *see also Seattle Hebrew Academy*, 26 Op. O.L.C. at 129 (same). That observation rings even truer fifteen years later, as the Supreme Court has continued to develop its First Amendment precedents. *Tilton* and *Nyquist* "essentially sanction discrimination between private institutions that are identically situated but for their religious status—and in that respect are in tension with the Court's free exercise jurisprudence." *Old North Church*, 27 Op. O.L.C. at 115; *see also Am. Atheists, Inc.*, 567 F.3d at 299 (noting that a broad reading of *Tilton* "would bring the decision into tension, if not outright conflict, with later cases"). Under *Trinity Lutheran*, status-based religious discrimination triggers strict constitutional scrutiny. 137 S. Ct. at 2019. If *Tilton* and *Nyquist* were still good law, any general education program that provided aid to educational institutions would risk violating *Trinity Lutheran* if it excluded devotional institutions, but also would risk violating *Tilton* and *Nyquist* if it did not.

Moreover, "many of the legal principles that supported those decisions have been discarded." *Old North Church*, 27 Op. O.L.C. at 116. *Tilton*

and *Nyquist* were, for example, largely premised on the notion that aid to a "pervasively sectarian" institution, even when channeled to religious uses through intervening private choice or when used solely for non-religious functions, "inescapably results in the direct and substantial advancement of religious activity." *Meek*, 421 U.S. at 366. The Supreme Court has since repudiated that doctrine. *See Mitchell*, 530 U.S. at 835–36 (plurality opinion); *id*. at 837 (O'Connor, J., joined by Breyer, J.); *Agostini*, 521 U.S. at 223–26. Indeed, in *Trinity Lutheran*, the Court struck down the Missouri policy that denied eligibility to churches, the most "pervasively sectarian" of institutions, for grants for playground surfaces, notwithstanding Justice Sotomayor's observation in dissent that this holding contradicted *Tilton* and *Nyquist*. *See Trinity Lutheran*, 137 S. Ct. at 2029–30 (Sotomayor, J., dissenting) ("The Church's playground surface—like a Sunday School room's walls or the sanctuary's pews—[is] integrated with and integral to its religious mission."). Accordingly, we do not believe that *Tilton* and *Nyquist* justify the conclusion that the Establishment Clause requires the prohibitions in sections 1066c(c) and 1068e(1).

## IV.

Because the Establishment Clause does not compel the religious-funding prohibitions in sections 1066c(c) and 1068e(1), it cannot justify the burdens those provisions impose on the free exercise of religion. That is not the end of the matter, however, because *Locke* upheld a limited restriction on the funding of religious activities—based upon the antiestablishment interest in not using taxpayer funds to pay for the training of clergy—even though the restriction was not required by the Establishment Clause. *See* 540 U.S. at 718–19, 721–22; *see also Trinity Lutheran*, 137 S. Ct. at 2019. As we have observed, *see supra* Part II, under *Locke* and *Trinity Lutheran*, the Free Exercise Clause question turns on whether the government has permissibly exercised its discretion to determine the scope of a government program—which may exclude certain religious uses—or whether it has impermissibly excluded otherwise qualified applicants because of their religious character.

The HBCU religious-funding restrictions fall into three broad categories. One denies loans under the program "to an institution in which a substantial portion of its functions is subsumed in a religious mission." 20 U.S.C. § 1066c(c). Two others deny program loans to facilities that are used for certain religious activities: no loans may be "used . . . for . . . any

religious worship or sectarian activity," *id.* § 1068e(1), and no loans may be "made . . . for any educational program, activity or service related to sectarian instruction or religious worship," *id.* § 1066c(c). Finally, two restrictions deny program loans to "school[s] or department[s] of divinity," as that phrase is defined in the statute. *Id.* §§ 1003(15), 1066c(c), 1068e(1).

## A.

We begin with the provision of the HBCU program that presents the most evident constitutional difficulty: the restriction on providing program loans "to an institution in which a substantial portion of its functions is subsumed in a religious mission." *Id.* § 1066c(c). Although the statute does not define what it means for a substantial portion of an institution's functions to be "subsumed in a religious mission," the phrase appears to derive from *Hunt v. McNair*, 413 U.S. 373 (1973), which observed that under the Court's precedent at the time (since discarded, *see supra* Part III.C), government aid violates the Establishment Clause "when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission." *Id.* at 743; *see also Sch. Dist. of City of Grand Rapids v. Ball*, 473 U.S. 373, 394 n.12 (1985) (quoting and applying same language from *Hunt*). Consistent with the Supreme Court's then-prevailing view, this statutory provision prohibits federal support for any pervasively sectarian institution—i.e., one that is "devoted to the inculcation of religious values and belief," including one that provides "integrated secular and religious education." *Meek*, 421 U.S. at 366.

We agree with your office that this provision unconstitutionally discriminates on the basis of an institution's religious character. ED Letter at 2–3; *accord* CRT Memo at 5; OLP Memo at 2–3; CIV E-mail. Here, as in *Trinity Lutheran*, the final restriction of section 1066c(c) does not merely define a secular government program to exclude religious activities, but instead defines and excludes the recipient based upon its religious identity. The restriction excludes an HBCU from eligibility for the program, simply because the school's functions are bound up in a "religious mission"; it directly targets organizations that are religious in nature. 20 U.S.C. § 1066c(c). That restriction thus sweeps more broadly than the restriction at issue in *Locke*. In *Locke*, the Supreme Court upheld the scholarship restrictions because they did not exclude sectarian institutions

and allowed students to use the scholarships at "pervasively religious schools" with mandatory courses in "devotional theology," so long as they offered degrees in subjects that the State had chosen to fund. *Locke*, 540 U.S. at 724–25. The restriction here, however, would deny loans under the program for capital projects that have no direct connection to the religious activities of an HBCU, simply because of the religious mission of the institution.

The HBCU capital-financing program guarantees loans for a broad range of capital projects, including repair, renovation, or acquisition of a classroom facility, library, laboratory, dormitory, "or other facility customarily used by colleges and universities for instructional or research purposes or for housing students, faculty, and staff." 20 U.S.C. § 1066a(5)(A). The program covers administrative facilities, student centers, equipment, health centers, and more, such as improvements to physical infrastructure, including roads and sewer drainage systems. *Id*. § 1066a(5)(B)–(H). Such projects need not have any inherent religious character, and *Trinity Lutheran* teaches that they do not acquire one merely because a religious institution carries them out. The final restriction of section 1066c(c) therefore "imposes a penalty on the free exercise of religion," *Trinity Lutheran*, 137 S. Ct. at 2021, and requires organizations to "'choose between their religious beliefs and receiving a government benefit.'" *Id*. at 2023 (quoting *Locke*, 540 U.S. at 720–21).

In short, the final prohibition in section 1066c(c) "expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Trinity Lutheran*, 137 S. Ct. at 2021. Although antiestablishment interests might justify a use-based religious-funding restriction under *Locke*, the Court in *Trinity Lutheran* specifically rejected an interest in "skating as far as possible from religious establishment concerns" as a basis for categorically excluding a religious organization from a generally available funding program. *Id.* at 2024. Accordingly, the portion of the statute that denies program loans to "an institution in which a substantial portion of its functions is subsumed in a religious mission" is unconstitutional. 20 U.S.C. § 1066c(c).

## B.

We consider next the funding restrictions concerning "religious worship," "sectarian activity," and "sectarian instruction," which are con-

tained, in slightly different form, in section 1066c(c) and section 1068e(1). Section 1066c(c) provides that loans under the HBCU capital-financing program may not be "made . . . for any educational program, activity or service related to sectarian instruction or religious worship." Section 1068e(1) provides that "[t]he funds appropriated under section 1068h," including the funds that guarantee HBCU capital-financing loans, "may not be used . . . for . . . any religious worship or sectarian activity." We agree with your office that these restrictions can and must be construed to avoid unconstitutionality. ED Letter at 2–4.

## 1.

Section 1068e(1) provides that the Department funds "may not be used . . . for . . . any religious worship or sectarian activity." Congress did not define "religious worship" and "sectarian activity," but we believe the provision is best construed to preclude the funding of projects directly tied to devotional activities. "Sectarian" activities would ordinarily be defined as ones that "support[] a particular religious group and its beliefs," *Black's Law Dictionary* 1557 (10th ed. 2014), or as activities that have "the characteristics of one or more sects [especially] of a religious character," *Webster's Third New International Dictionary* 2052 (2002). And even without the adjective "religious" preceding it, the term "worship" would ordinarily be defined as a "form of religious devotion, ritual, or service showing reverence, esp[ecially] for a divine being." *Black's Law Dictionary* at 1844. The terms "religious worship" and "sectarian activity" do not cover an *institution* merely because it has a religious character or religious affiliation: they cover only *activities* with a devotional religious character.

Under Supreme Court precedent, the government may constitutionally decline to support such activities. In both *Locke*, 540 U.S. at 722 & n.5, and *Trinity Lutheran*, 137 S. Ct. at 2023, the Court noted that, even in providing a broadly secular aid program, the government has a legitimate interest in avoiding using taxpayer funds to support "church leaders," which "lay at the historic core of the Religion Clauses." *Locke* cited historical evidence suggesting that "[m]ost States that sought to avoid an establishment of religion around the time of the founding placed in their constitutions formal prohibitions against using tax funds to support the ministry." 540 U.S. at 723. Such support included funds to "'erect or support any place of worship.'" *Id*. (quoting Pa. Const. art. II (1776), *in*

5 *Federal and State Constitutions, Colonial Charters, and Other Organic Laws* 3081, 3082 (1909)). That discussion reflects that the government's interest in avoiding support for religious activities extends to worship, prayer, and devotional religious education.

The prohibition in section 1068e(1) on funding "any religious worship or sectarian activity" therefore fits the mold of *Locke* rather than *Trinity Lutheran*: it restricts financing based on the religious use of the underlying project, rather than the religious character of the recipient. The provision avoids support for projects primarily devoted to religious worship, the training of clergy, and other explicitly devotional activities. But it does not preclude a religious HBCU from receiving loans for general educational activities separate from such projects, even if the educational activities include some religious elements. By supporting an HBCU's educational mission, the restriction "goes a long way toward including religion in its benefits." *Locke*, 540 U.S. at 724. At the same time, it avoids supporting capital-improvement projects that predominantly support worship, prayer, and other devotional religious activities. It is thus a lawful exercise of Congress's discretion to define a federal aid program, rather than a penalty on the free exercise of religion. Congress may permissibly decline to subsidize religious activity, just as Congress may decline to fund other constitutionally protected activities, such as lobbying. *See Regan*, 461 U.S. at 548–49.

Constitutional concerns would arise if the restriction were construed to deny funding for capital-improvement projects for religious institutions more broadly. To avoid these concerns, we must construe the restriction narrowly. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("'[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895)). If, for example, section 1068e(1) prohibited a loan to repair an HBCU's roads or sewers, simply because some classrooms are devoted to the training of clergy or some churches line those roads or use those sewers, then that restriction would be tantamount to denying a loan simply because an institution is religious in character. But we do not believe the statute must be read in that manner: a project loan cannot reasonably be described as being "for" religious worship or sectarian activity simply because it may advance an institution's religious or sectarian mission to some degree. A loan, however, may be "for" such purposes if the project is to build or repair a campus chapel, a prayer

room, or a classroom devoted to the training of clergy. We think that a loan is "for" such purposes if it would finance a capital-improvement project for facilities predominantly devoted to religious worship or devotional activity, not those with an insubstantial or incidental connection to those activities.

Restricting funding closely tied to explicitly religious activities is consistent with federal government practice. Although the Establishment Clause does not forbid all such aid, *see, e.g.*, *Old North Church*, 27 Op. O.L.C. at 102–03, Congress has enacted a number of religious-funding restrictions.[5] The President too has directed agencies to permit religious organizations to participate in federally funded social-service programs on the condition that they not "use direct Federal financial assistance . . . to support or engage in any explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization)." Exec. Order No. 13559, § 1(b) (Nov. 17, 2010),

---

[5] *See, e.g.*, Act of June 18, 1896, ch. 398, 29 Stat. 321, 345; 20 U.S.C. § 122 ("No part of the appropriations made by Congress for the Howard University shall be used, directly or indirectly, for the support of the theological department of said university, nor for the support of any sectarian, denominational, or religious instruction therein[.]"); *id.* § 1011k(c) ("[N]o project assisted with funds under subchapter VII . . . shall ever be used for religious worship or a sectarian activity or for a school or department of divinity."); *id.* § 1137(c) ("No institutional payment or allowance under section 1134b(b) or 1135d(a) of this title shall be paid to a school or department of divinity as a result of the award of a fellowship under subpart 1 or 2 of this part, respectively, to an individual who is studying for a religious vocation."); *id.* § 7885 ("Nothing contained in this chapter shall be construed to authorize the making of any payment under this chapter for religious worship or instruction."); 25 U.S.C. § 1803(b) ("Funds provided pursuant to this subchapter shall not be used in connection with religious worship or sectarian instruction."); *id.* § 1813(e) ("No construction assisted with funds under this section shall be used for religious worship or a sectarian activity or for a school or department of divinity."); *id.* § 2502(b)(2) ("Funds provided under any grant made under this chapter may not be used in connection with religious worship or sectarian instruction."); *id.* § 3306(a) ("None of the funds made available under this subchapter may be used for study at any school or department of divinity or for any religious worship or sectarian activity."); 34 U.S.C. § 12161(d)(2)(D) ("Such community-based organization . . . may not use such funds to provide sectarian worship or sectarian instruction."); 42 U.S.C. § 290kk-2 ("No funds provided under a designated program shall be expended for sectarian worship, instruction, or proselytization."); *id.* § 9858k(a) ("No financial assistance provided under this subchapter, pursuant to the choice of a parent under section 9858c(c)(2)(A)(i)(I) of this title or through any other grant or contract under the State plan, shall be expended for any sectarian purpose or activity, including sectarian worship or instruction.").

75 Fed. Reg. 71,319, 71,320 (Nov. 22, 2010), *amending* Exec. Order No. 13279, § 2(g) (Dec. 12, 2002), 67 Fed. Reg. 77,141 (Dec. 16, 2002).[6] The Department has issued regulations consistent with these orders. *See* 34 C.F.R. § 75.52(c)(1) (2018) ("A private organization that engages in explicitly religious activities, such as religious worship, instruction, or proselytization, must offer those activities separately in time or location from any programs or services supported by a grant from the Department"); *id.* § 76.52(c)(1) (same for subgrants from States).

The federal government also has a history of supporting religion and religious practice. As we have observed, *see supra* note 3, the federal government since the time of the Founding has employed chaplains, funded religious education for Indians, and provided land grants to religious organizations and tax exemptions to religious bodies. But the federal government has in many instances excluded explicitly religious activities, including religious instruction, from more general funding programs, and thus has long asserted an interest in avoiding the funding of religious instruction akin to that recognized by the Court in *Locke*. That history reflects that there is "play in the joints" between what the Establishment Clause permits and what the Free Exercise Clause does not prohibit Congress from enacting. *Trinity Lutheran*, 137 S. Ct. at 2019; *Locke*, 540 U.S. at 718.

There is also no indication that the religious-funding restrictions in the HBCU capital-financing program were motivated by religious animus. No matter how narrowly drawn, a religious-funding restriction stemming from "hostility toward religion," *Locke*, 540 U.S. at 721, is unconstitutional. *See, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731–32 (2018). Such animus concerns have been raised with the so-called "Baby Blaine" amendments that began to appear in state constitutions in the 19th century. Those provisions generally prohibited state-sponsored financial support for religious schools and emerged from a climate of anti-Catholic hostility. *See Mitchell*, 530 U.S. at 828 (plurality opinion); *Locke*, 540 U.S. at 723 n.7. But the restrictions at issue here emerged not in the 19th century, but rather in the late 1980s and early 1990s, when Supreme Court precedent could be read to forbid a government, even in a religion-neutral funding program,

---

[6] When these two orders were amended in certain respects in 2018, the language quoted above was left undisturbed. Exec. Order No. 13831, § 2 (May 3, 2018), 83 Fed. Reg. 20,715, 20,715 (May 8, 2018).

from supporting religious educational institutions.[7] *See Rosenberger*, 515 U.S. at 885 n.9 (Souter, J., dissenting). Indeed, as we have noted, *see supra* Part IV.A, the text of these restrictions—the best available evidence of legislative intent—derives directly from then-applicable Supreme Court precedent. It was only later that the Court overruled cases like *Aguilar*, *Ball*, *Meek*, and *Wolman v. Walter*, 433 U.S. 229 (1977), which had read the Establishment Clause to proscribe financial support for religious educational institutions even in government programs that were entirely neutral with respect to religion. *See Mitchell*, 530 U.S. at 835 (plurality opinion) (overruling *Wolman* and *Meek*); *id*. at 837 (O'Connor, J., concurring in the judgment) (same); *Agostini*, 521 U.S. at 235 (overruling *Aguilar* and *Ball*). What evidence we have thus suggests that Congress's motive for these restrictions was likely grounded in a legitimate desire to conform the statute to the Supreme Court's then-prevailing Establishment Clause precedent, not in religious animus.

In short, section 1068e(1), in restricting loans under the program for "any religious worship or sectarian activity," is constitutional as we have construed it.

## 2.

Section 1066c(c) parallels that part of section 1068e(1), but it may sweep more broadly, because it applies to any program "related to" sectarian instruction or religious worship, and "related to" is often read expansively. *See, e.g.*, *Coventry Health Care of Mo., Inc. v. Nevils*, 137 S. Ct. 1190, 1197 (2017).

We agree with your office that we should construe this provision to avoid conflict with the Free Exercise Clause. ED Letter at 3–4. The relevant portion of section 1066c(c), on its face, denies loans under the program for certain religious "program[s], activit[ies] or service[s]" and therefore appears to be primarily a restriction on the Department's guaranteeing loans for facilities used for religious activities. This provision illustrates that the line between a restriction that permissibly denies funding to religious uses, and one that denies funding based on religious

---

[7] *See* Higher Education Amendments of 1986, Pub. L. No. 99-498, sec. 301(a), § 357(1), 100 Stat. 1268, 1307 (now codified at 20 U.S.C. § 1068e(1)); Higher Education Amendments of 1992, Pub. L. No. 102-325, sec. 704, § 724(c), 106 Stat. 448, 745 (now codified at 20 U.S.C. § 1066c(c)).

status, can be difficult to draw. *See Trinity Lutheran*, 137 S. Ct. at 2025 (Gorsuch, J., concurring). If a facially use-based religious-funding restriction is given too broad a sweep, it might well amount to status-based religious discrimination. For example, even the entirely secular programs or activities of a religious HBCU could be viewed as "related to" the sectarian instruction or religious worship that takes place elsewhere within the institution. But to deny guaranteed loans to a religious HBCU for secular facilities or functions would deny support in a manner not tightly connected to any religious use of those funds. The broader the restriction, the more it risks penalizing the free exercise of religion and discriminating based on religious status under *Trinity Lutheran*, like the restriction that we have already concluded is unconstitutional. *See supra* Part IV.A. To consider all activities of a religious school to be "related to" sectarian instruction, and prohibit funding for the school on that basis, would risk collapsing the distinction between religious status and religious use recognized in *Locke* and *Trinity Lutheran*.

Here, however, a saving construction is reasonably available. Section 1066c(c) contains three "Religious Activity prohibition[s]." The other two are directed at broad features of the institution: programs, activities, and services provided by a "school or department of divinity" and those provided by "an institution in which a substantial portion of its functions is subsumed in a religious mission." 20 U.S.C. § 1066c(c). By contrast, it is plausible to view the prohibition on funding "any educational program, activity or service related to sectarian instruction or religious worship" as more narrowly focused on features of the discrete projects being funded, rather than features of the institution as a whole. If the term "related to" were read broadly—say, to cover general programs and services provided by a religious institution—it would largely swallow the two prohibitions covering institutional features. Moreover, since the financing program is focused on supporting particular capital-improvement projects, it is also plausible to view the discrete "program, activity or service" being aided as "related to" sectarian instruction or religious worship only when the discrete project being financed is itself religious. *See id.* § 1066a(5). As we have discussed in analyzing the other use-based funding restrictions in the statute, *see supra* Part IV.B.1, we think a project is religious in that sense when it is devoted predominantly to religious activities.

We therefore construe the prohibition on loaning money to programs "related to sectarian instruction or religious worship" as applying only to loans that fund discrete projects that bear a specific and direct relation to

sectarian instruction or worship, in that they will be used predominantly for such functions. *Cf. Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 146 (2002) (noting that the Court has "recognized that the term 'relate to' cannot be taken 'to extend to the furthest stretch of its indeterminacy'"); *Hunt*, 413 U.S. at 743 (noting, in the Establishment Clause context, that a government program can have the effect of advancing religion "when it funds a *specifically* religious activity in an otherwise substantially secular setting" (emphasis added)). That reading brings section 1066c(c)'s first restriction in line with section 1068e(1)'s parallel restriction. Both provisions preclude guaranteed loans from funding facilities predominantly devoted to the prohibited religious functions, such as a new campus chapel or prayer room, but do not preclude funding a dormitory or dining hall—even one run by a religious institution. So construed, both restrictions narrowly advance the government's interest in not funding explicitly religious activities, such as worship or prayer. The statutes thus define the scope of this secular program to exclude loans for facilities used for sectarian instruction and religious worship in a manner consistent with the Free Exercise Clause.

## C.

The final issue concerns the provisions that limit assistance to "a school or department of divinity." Section 1066c(c) restricts loans under the program for "any educational program, activity or service" offered by such an institution; section 1068e(1) restricts the use of "funds appropriated" under the HBCU program "for" such an institution.

If this provision categorically barred a "sectarian" or "denominational" school from receiving support, it would amount to a status-based religious discrimination under *Trinity Lutheran*. ED Letter at 2–3. The statute, however, defines a "school or department of divinity" based upon its program of instruction, rather than on its religious views or character. The term is defined as "an institution, or a department or a branch of an institution, the program of instruction of which is designed for the education of students" in order "(A) to prepare the students to become ministers of religion or to enter upon some other religious vocation . . . ; or (B) to prepare the students to teach theological subjects." 20 U.S.C. § 1003(15). We construe the provision to be similar to the scholarship restriction upheld in *Locke*—a funding restriction that turns upon the educational program, rather than the religious character, of an institution.

The funding restriction here does not single out an HBCU simply because it has a religious mission. Rather, it targets schools or departments whose programs of instruction necessarily involve "the training of clergy." *Trinity Lutheran*, 137 S. Ct. at 2023. The restriction applies to an "institution, or a department or a branch of an institution, *the* program of instruction of which is designed" for the religious training specified in the statute. 20 U.S.C. § 1003(15) (emphasis added). The use of the definite article suggests that the restriction applies only if the institution, or its department or branch, offers vocational religious education as its only program of instruction. *See Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1514 (2019) (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (interpreting "the definite article" in the phrase "the person" to mean that there is "generally only one proper respondent to a given prisoner's habeas petition")). This restriction is thus applicable only to an HBCU, or a department or branch of an HBCU, with programs of instruction wholly devoted to the training of clergy (or, potentially, as discussed below, non-devotional religious education). By contrast, an HBCU that offers other programs of instruction, in addition to vocational religious education, may seek loan support for any school or department that offers such separate programs.[8]

That seems to us the most natural reading of the statute. But it is, at a minimum, a permissible interpretation, and so construed the restrictions are similar to those upheld by the Supreme Court in *Locke*. As in *Locke*, the restrictions limit eligibility for assistance based upon the educational activities being supported. In *Locke*, the State of Washington prohibited the use of scholarships to fund degrees in "theology," which the Court understood to mean "degrees that are devotional or designed to induce religious faith." 540 U.S. at 716 (citations omitted). The Court sustained that restriction, even though a student pursuing such a degree in theology might well have received an education in secular subjects too. *Id*. at 720. The Court held that Congress could fund, or not fund, a "distinct category of instruction," *id*. at 721, and, as the Court later explained, the program there was "in keeping with" the government's "antiestablishment interest

---

[8] An HBCU may be eligible for a loan under the program even if it describes itself as a "divinity school" or if the majority of its programs involve the training of clergy or teachers of theology. Such a school, or a department or branch thereof, is ineligible only if it solely offers programs of instruction devoted to vocational religious education.

in not using taxpayer funds to pay for the training of clergy," *Trinity Lutheran*, 137 S. Ct. at 2023.

If Washington could decline to provide scholarships to students pursuing degrees in theology, then we believe Congress could decline to support programs of education wholly devoted to vocational religious education. We recognize that, if an institution is entirely devoted to the religious training specified in the statute, then the restriction makes the school ineligible for guaranteed loans under the program. But that consequence does not seem different from *Locke*: the student there could not receive the state scholarship to pursue a theology degree, even though he may have studied non-religious subjects as well. *See Locke*, 540 U.S. at 726. Such a restriction is consistent with *Locke*'s holding that a government program may be defined in a way that excludes the training of clergy. Under this reading, however, an HBCU may still receive guaranteed loans under the program for the construction or repair of facilities, so long as the school, department, or branch in question has at least one other program of instruction, even if its programs of instruction otherwise involve religious training within the meaning of 20 U.S.C. § 1003(15).

The funding restriction here may be broader than in *Locke* in one respect. In *Locke*, the Court held that Washington could exclude scholarship funds from supporting "degrees that are devotional in nature or designed to induce religious faith." *Locke*, 540 U.S. at 716 (internal quotation marks omitted). Here, the restriction on loans for divinity schools or departments arguably sweeps beyond devotional education to include programs of instruction that "prepare the students to teach theological subjects," whether or not those programs are devotional in nature. 20 U.S.C. § 1003(15)(B). There may be some ambiguity concerning what it means to "prepare the students to teach theological subjects," since, as Justice Thomas has observed, "the study of theology does not necessarily implicate religious devotion or faith." *Locke*, 540 U.S. at 734 (dissenting opinion); *see also Webster's Third New International Dictionary* 2371 (2002) (defining "theology" to include "rational interpretation of religious faith, practice, and experience"); 17 *Oxford English Dictionary* 898 (2d ed. 1989) (defining "theology" as the "study or science which treats of God, His nature and attributes, and His relations with man and the universe"). The restriction thus could apply to programs in which theology is treated as a subject of scholarly interest, without any devotional affiliation or religious creed. Such restrictions could cover departments with Ph.D. programs in religious studies that approach theology

through an academic lens—sociological, anthropological, philosophical, or otherwise—as well as through a devotional or sectarian lens.

We do not believe that a restriction on supporting the training of teachers of theology necessarily implicates the Free Exercise Clause. The Religion Clauses protect religious belief (and non-belief), not necessarily the academic study of religion. *See, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) ("[T]o have the protection of the Religion Clauses . . . claims must be rooted in religious belief."); *Davis v. Beason*, 133 U.S. 333, 342 (1890) ("The term 'religion' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will."); *cf. Van Orden v. Perry*, 545 U.S. 677, 690–91 (2005) (plurality opinion) (holding that it was permissible for Texas to display the Decalogue on its State Capitol Grounds because "the ten Commandments have an undeniable historical meaning," and "[s]imply having religious content or promoting a message consistent with a religious doctrine" does not constitute an establishment of religion). The Free Exercise Clause protects an individual's or entity's status as a Catholic believer or as a Catholic church, but not necessarily as a historian studying the works of Thomas Aquinas or as a department of religious history.

Nor does prohibiting support for training teachers of theology seem to constitute status-based religious discrimination. The statute excludes support for a single subject—religious educational training—and does not broadly preclude a religious HBCU from receiving assistance for a range of secular activities. The restriction therefore resembles those cases in which the Supreme Court has held that the government need not subsidize particular categories of speech. *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 193–94 (1991). Just as the government may, for example, decline to provide tax exemptions to the portion of a nonprofit organization devoted to lobbying, *see Regan*, 461 U.S. at 546, the government may here decline to guarantee loans for the portion of an HBCU that provides degrees in theology—a "distinct category of instruction." *Locke*, 540 U.S. at 721; *see id.* at 720 n.3 (rejecting argument that the funding restriction violated the freedom of speech).

Because we are not evaluating the restriction here in the context of a particular grant application, we need not and do not reach a definitive conclusion on how the religious-funding restriction would apply to non-devotional programs that "prepare the students to teach theological sub-

jects." 20 U.S.C. § 1003(15). But we note that the application of the restriction to such programs raises different First Amendment questions.

## V.

For these reasons, we conclude that the restriction on providing program loans "to an institution in which a substantial portion of its functions is subsumed in a religious mission," 20 U.S.C. § 1066c(c), violates the Free Exercise Clause. The remaining restrictions in section 1066c(c) and section 1068e(1) can and must be construed to withstand Free Exercise Clause scrutiny. Should the Department establish a policy not to enforce the unconstitutional portion of section 1066c(c), or should it provide support to an otherwise unqualified applicant, in contravention of this provision (or any other statute), the Department should report that decision to Congress within thirty days of establishing the policy. *See* 28 U.S.C. § 530D(a)(1)(A)(i), (b)(1), (e); *Constitutionality of the Direct Reporting Requirement in Section 802(e)(1) of the Implementing Recommendations of the 9/11 Commission Act of 2007*, 32 Op. O.L.C. 27, 28 n.2 (2008).

HENRY C. WHITAKER
*Deputy Assistant Attorney General*
*Office of Legal Counsel*